FILED

2019 SEP 23 AM 11: 18

1 **CHARANJOT SINGH**
2 4195 Chino Hills Parkway
   Chino Hills, CA 91709
3 909/257-6769

4 Plaintiff In Pro Per

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

CHARANJOT SINGH,

        Plaintiff,

vs.

7-ELEVEN, INC., a Texas Corporation; TAMMY ROZGA, DAVID JAMES MARKS, JOE DEPINTO, and DOES 1 to 10 Inclusive,

        Defendants.

CASE NUMBER: EDCV19-01820-JFW-KK

**COMPLAINT FOR DAMAGES FOR:**

1. **DURESS**
2. **BREACH OF CONTRACT**

DEMAND FOR JURY TRIAL

    Plaintiff CHARANJOT SINGH (hereinafter "SINGH") for his Complaint for Damages against 7-ELEVEN, INC. (hereinafter "7-ELEVEN), TAMMY ROZGA (hereinafter "ROZGA"), DAVID JAMES MARKS (hereinafter "MARKS"), AND JOE DEPINTO (hereinafter "DEPINTO") (hereinafter collectively "Defendants") states as follows:

### GENERAL ALLEGATIONS
#### (Against All Defendants)

    1.    This is an action for Duress and Breach of Contract.

    2.    Defendant 7-Eleven is the largest convenience store chain in the world, with more than 31,000 locations worldwide.

    3.    Since September 20, 2006, SINGH had been a successful franchisee of 7-ELEVEN, operating store number 2175-13994G, which he purchased from former franchise owners Richard and Beverly Fuss. He paid $140,000.00 to Robert and Beverly Fuss and $100,000.00 to 7-ELEVEN for the franchise and merchandise fees, for a total of $240,000.00. Said store is located at 705 East 5th Street, Azusa, Los Angeles County, California 91702-3858 (the "Store"). Jurisdiction and venue are appropriate for this Court.

    4.    Since opening the Store, SINGH had operated as a good and profitable franchisee.

1
**COMPLAINT FOR DAMAGES**

5. Plaintiff SINGH is informed and believes that at all times herein mentioned Defendant 7-ELEVEN was a Texas corporation with its corporate office located at 3200 Hackberry Road, Irving, Texas 75063, and is duly qualified to do business in California. 7-ELEVEN's registered agent for service of process is Corporate Creations Network, Inc., located at 1430 Truxtun Avenue, 5th Floor, Bakersfield, California 93301.

6. Plaintiff SINGH is informed and believes that at all times mentioned herein Defendant ROZGA was the Market Manager for 7-ELEVEN.

7. Plaintiff SINGH is informed and believes that at all times mentioned herein Defendant MARKS was the Field Consultant for 7-ELEVEN assigned to Plaintiff's area.

8. Plaintiff SINGH is informed and believes that at all times mentioned herein Defendant DEPINTO was the Chief Executive Officer of 7-ELEVEN.

9. SINGH is ignorant of the true names and capacities of defendants sued herein as DOES 1 through 30, Inclusive, and therefore sues these defendants by such fictitious names. SINGH will amend this complaint to allege their true names and capacities when ascertained.

10. SINGH is informed and believes and thereon alleges that, at all times herein mentioned, each of the defendants sued herein was the agent and employee of each of the remaining defendants and was at all times acting within the purpose and scope of such agency and employment.

11. For 11 years SINGH has, in good faith, operated his Store and complied with all of the provisions of the franchise agreement entered into between SINGH and 7-ELEVEN.

12. On or about February 2017, SINGH encountered an accounting issue with 7-ELEVEN. SINGH opened a case regarding a miscalculated shortage. SINGH attempted to resolve the issue himself but could not get the numbers to add up; he consulted 7-ELEVEN for help. Rather than assisting SINGH to resolve the problem, 7-ELEVEN withdrew funds from SINGH's equity account with no explanation.

13. Commencing on or about March 16, 2017, 7-ELEVEN began a series of actions against SINGH which constitute unfair business practices as defined by The California Unfair Business Practices Act. On said date the health inspector assigned to the Store's area visited the Store to perform an inspection. The Store was awarded an "A" grade but SINGH was instructed to fix two (2) issues – the water heater and a sanitizer strip.

14. On or about March 18, 2017, the health inspector returned to the Store to check if the issues were rectified. SINGH informed the health inspector that more time was needed because he was required to work with 7-ELEVEN maintenance. The health inspector told SINGH to fix the issues immediately.

15. On or about March 19, 2017, SINGH purchased a new water heater with his own funds knowing it would take time to go through 7-ELEVEN's hierarchy to obtain approval. SINGH also replaced the sanitation strip.

16. On or about March 21, 2017, the health inspector again returned to the Store to check if the issues were rectified. On his way out, the health inspector noticed two (2) baby cockroaches and ordered the Store to be closed. 7-ELEVEN notified the health inspector that the Store looked fine as far as cleanliness; however, the problem could be from damaged and decaying infastructure and poor work quality of the exterminator.

17. On or about March 22, 2017, 7-ELEVEN sent a deep-cleaning crew and exterminator to the Store. The cleaning crew and exterminator arrived between 9:00 and 10:00 p.m. and stayed until approximately 4:00 a.m. The exterminator was unable to identify the point of entry and source of the cockroach problem. SINGH was required to remain inside the store while it was closed, thereby exposing SINGH to noxious and toxic fumes.

18. On or about March 23, 2017, a maintenance crew from 7-ELEVEN came to the Store to survey the interior and exterior repair and possible points of entry for the pest problem. However, this crew did not inspect the roof. There was an allegation made that an employee was disrespectful to the health inspector. This allegation was totally false. SINGH met with the Department Chief Health Inspector for Los Angeles County and let him know that the Store was ready for inspection, and such inspection was scheduled for the next day.

19. On this same date, 7-ELEVEN's Market Manager at that time came to the Store very agitated. It was her first visit in approximately two (2) years. She held SINGH responsible for the closure of the Store and issued four (4) Letters of Notification regarding the $7,000.00 imbalance.

20. At this time, an ultimatum was presented by the Market Manager that SINGH should sell the store or lose his equity. She threatened SINGH that she would return with more notices.

21. On March 24, 2017, the maintenance personnel continued with the repairs but did not repair the roof. The leaking pipes and sink were the only things that were repaired. However, the extermination company sprayed again; and, again, SINGH was forced to remain inside the Store with the noxious and toxic fumes. SINGH reminded Defendant MARKS that the drains should have been sealed.

22. On this same date SINGH requested Defendant MARKS to investigate the accounting issue ($7,300.00 being taken from SINGH's equity account due to a false shortage). SINGH tried to strongly express his concern over this issue because it was causing him a great deal of mental and financial stress. There was no response. **Neither Defendant ROZGA, Defendant MARKS, nor 7-Eleven ever has investigated this issue.**

23. Also on March 24, 2017, the health inspector arrived again to inspect the Store. A quality assurance inspector from 7-ELEVEN also did an inspection and the Store did not pass due to one pest. The inspector insisted that SINGH focus more on sealing the doors, windows and cracks.

24. During the period of March 27 through 29, 2017, the Store was sprayed and the maintenance personnel installed a new mop sink, continued sealing cracks and fissures, sweepers under the door, and replacing tiles. Again, the roof was not fixed and nothing done about the cleanliness issue.

25. SINGH was specifically cited for two (2) breaches from the Market Manager for not adhering to 7-ELEVEN's food safety standards (pests) and for violating California's Food Safety Law. Defendant ROZGA said she would charge SINGH's equity account approximately $4,500.00 for lost gross profits for the nine (9) days the store was closed. Defendant ROZGA threatened SINGH that he should sell the Store or he would be forced out. It is SINGH's information and belief that Defendant ROZGA was already marketing his Store for sale.

26. On March 28, 2017, SINGH met with Defendant MARKS and the Quality Assurance Manager. The Health Inspector requested a re-inspection. SINGH also received a Letter of Notification for using bad language in front of the inspector, which inspector has verified did not happen. The Quality Assurance Manager questioned the health inspector if inappropriate language was used with him and the health inspector denied any such use of inappropriate language,

27. On March 29, 2017, the health inspector visited the Store and gave a grade B and reopened the store.

28. On April 2, 2017, at approximately 11:00 p.m., while SINGH was working in the office/storage area, a tile fell from the roof and hit SINGH on the head and shoulder. Since SINGH could not get help, he called 911. Emergency responders arrived, checked SINGH out, and offered to transport him to the hospital. Since SINGH did not have health insurance, he declined.

29. SINGH tried to inform DEFENDANT MARKS of his injury and to determine what the protocol was for such a situation as well as a contact for medical attention. Defendant MARKS did not respond.

30. SINGH was driven home and remained disoriented, in pain, and nauseated. SINGH's shoulder and neck remained moderately painful.

31. On April 3, 2017, SINGH went to Urgent Care in Rancho Cucamonga and paid $100.00 out-of-pocket for the visit. The nurse at the urgent care facility attempted to contact Defendant MARKS for payment or workers compensation account information. Defendant MARKS answered the call but told the nurse he would call back in ten (10) minutes, which he never did. SINGH remained at the urgent care facility for a total of two-and-one-half (2-1/2) hours. When Defendant MARKS finally responded, he was not concerned about SINGH's well-being, the protocol SINGH was to follow, or the medical attention SINGH required. Defendant MARKS merely asked SINGH to take pictures of the roof. SINGH informed Defendant MARKS that he was in no condition to worry about pictures whereupon Defendant MARKS told SINGH not to worry, that he had already taken pictures.

32. The doctor at the urgent care facility recommended that x-rays be taken but SINGH could afford more tests. That was one of the reasons SINGH contacted Defendant MARKS, to ascertain whether 7-ELEVEN would accept financial responsibility for his injuries.

33. One April 4, 2017, maintenance personnel from 7-ELEVEN went to the Store and repaired the ceiling. However, SINGH was unable to work or drive for a few days. He suffers from neck and shoulder pain and headaches.

34. Since the date the Store closed for the pest problem, 7-ELEVEN has been relentlessly trying to drive SINGH out of business. 7-ELEVEN has carried out a pattern of constant and needless harassment. During all of this, 7-ELEVEN personnel has been following SINGH. SINGH has observed the same Caucasian male in different automobiles usually bearing dealership plates (STG on plate). Once this

Caucasian male was accompanied by someone in a Toyota Tacoma, license plate #7E4711. SINGH believes that it is someone from 7-ELEVEN's loss prevention department or a private investigator.

35. 7-ELEVEN demanded that SINGH replenish his "equity account" with $10,000.00 or face a non-curable breach and lose his Store as well as any equity he has in the business.

36. 7-ELEVEN continued to have the outside of the building sprayed because bugs were present. 7-ELEVEN maintenance personnel installed a sanitation method and air curtain over the door and replaced a total of 28 tiles.

38. Upon information and belief, 7-ELEVEN instituted a nationwide scheme to improperly intimidate and terminate long-term franchises, with the goal of acquired successful stores. Such scheme has been characterized as "churning."

39. Upon further information and belief, 7-ELEVEN's intimidation and termination efforts are primarily focused on the states of New York, New Jersey, and California.

40. To achieve its goal, 7-ELEVEN utilizes coercive and unlawful techniques; and, in some instances, has engaged in stalking franchisees.

41. The sole purpose of 7-ELEVEN's efforts is to take care a store, at no cost, with the intent to re-sell the store to a new franchisee.

## FIRST CAUSE OF ACTION FOR DURESS

**(Against All Defendants)**

42. SINGH re-alleges each and every allegation contained in paragraphs 1 through 41 and by this reference incorporates those paragraphs into this cause of action as if they were fully set forth herein.

43. The apparent consent of SINGH to the personal treatment as a franchisee of 7-ELEVEN and its agents and/or employees ROZGA, MARKS and DEPINTO of himself referred to above was not real, mutual, or free in that it was obtained through duress and menace as herein alleged.

44. As set forth above, SINGH was an authorized franchisee of Defendant 7-ELEVEN and was subject to the terms and conditions of the franchise agreement.

45. Throughout the franchise term, as stated above, Defendants, and each of them, threatened SINGH that if he did not comply with the directions from Defendants, such as remain in his store during fumigation process, did not subject his equity account to unfounded deduction, and accept the

settlement offer given to him at mediation, Defendant 7-ELEVEN would cancel his franchise agreement and take back his store.

46. Additionally, Defendant 7-ELEVEN utilized the equity in a franchisee's open account as a tool to manipulate SINGH's financial condition. Specifically, Defendant 7-ELEVEN manipulated SINGH as follows:

    a. Defendant 7-ELEVEN took approximately $7,000.00 in maintenance costs while ignoring the fact that it was Defendant 7-ELEVEN who allowed for years the entire infrastructure of SINGH's store to crumble.

    b. Ignoring a mistake made by Defendant 7-ELEVEN's field consultant to change the store from a fixed change fund to a variable change fund, causing a fictitious shortage of $7,000.00. 7-ELEVEN failed to research and fix the issue. SINGH notified Defendant 7-ELEVEN of the issue but Defendant 7-ELEVEN jumped to its conclusion maliciously and without justification and withdrew $7,000.00 from SINGH's open account, dropping the equity into a negative status, thus making SINGH vulnerable to a breach of contract with no cure.

    c. Even though Defendant 7-ELEVEN claims to be a 50% owner with SINGH, such is not true. Defendant 7-ELEVEN withdrew approximately $4,200.00 to compensate itself for lost gross profits for the time the store was closed as stated above. Defendant 7-ELEVEN maintained a system whereby it reaped a 3-tire profit from SINGH – (1) the $4,200.00 profit that would have been realized if store had been open for the 9 days it was closed and which was deducted from SINGH's equity account (1st tier), (2) SINGH paid interest on the merchandise during the 9 days the store was closed (2nd tier), and (3) upon re-opening, the merchandise was sold thereby generating another $4,200.00 profit (3rd tier).

47. In order to protect his business and personal interests, SINGH considered that he had no reasonable alternative and that it was necessary to agree to the settlement offered during mediation. Any and all apparent consent of SINGH to the settlement was obtained from him solely through the duress and the menace of Defendants, and each of them. SINGH would not have consented to the settlement had it not been for the duress and menace.

48. SINGH seeks rescission of the settlement because SINGH has no other adequate remedy at law. If the settlement is not rescinded, SINGH will suffer irreparable harm and injury because SINGH will

be deprived of his bargain by having to surrender his business to Defendants.

49. In addition to the loss of the Store through the settlement, SINGH has also lost his initial investment with no financial reimbursement from 7-ELEVEN.

## SECOND CAUSE OF ACTION FOR BREACH OF CONTRACT

### (Against All Defendants)

50. SINGH re-alleges each and every allegation contained in paragraphs 1 through 49 and by this reference incorporates those paragraphs into this cause of action as if they were fully set forth herein.

51. On or about September 20, 2006, at Azusa, Los Angeles County, California, SINGH and Defendant 7-ELEVEN entered into a written franchise agreement, a copy of which is attached as Exhibit 1 and made a part of this pleading.

52. SINGH has performed all conditions, covenants, and promises required on his part to be performed in accordance with the terms and conditions of the franchise agreement. Defendants, and each of them, have breached this agreement as set forth in the following paragraphs.

53. On or about February 2017, Defendant 7-ELEVEN, by and through their agents and employees, breached the franchise agreement by withdrawing funds from SINGH's equity account with no explanation.

54. On or about March 22, 2017, 7-ELEVEN required SINGH to remain inside the store while it was closed and being fumigated, thereby exposing SINGH to noxious and toxic fumes.

55. On March 23, 2017, 7-ELEVEN's Market Manager at that time (ROZGA) came to the Store and held SINGH responsible for the closure of the Store and issued four (4) Letters of Notification regarding the $7,000.00 imbalance.

56. By allowing ROZGA to issue an ultimatum on behalf of 7-ELEVEN that SINGH should sell the store or lose his equity. She threatened SINGH that she would return with more notices.

57. On March 24, 2017, SINGH was again forced to remain inside the Store while it was further fumigated and was subjected to noxious and toxic fumes.

58. On this same date SINGH requested Defendant MARKS to investigate the accounting issue ($7,300.00 being taken from SINGH's equity account due to a false shortage). Defendants, and each of them breached the franchise agreement by refusing to investigate this accounting issue.

59. SINGH was specifically cited for two (2) breaches from the Market Manager for not adhering to 7-ELEVEN's food safety standards (pests) and for violating California's Food Safety Law. Defendant 7-ELEVEN breached the franchise agreement by allowing Defendant ROZGA to threaten to charge SINGH's equity account approximately $4,500.00 for lost gross profits for the nine (9) days the store was closed. Defendant ROZGA threatened SINGH that he should sell the Store or he would be forced out. It is SINGH's information and belief that Defendant ROZGA was already marketing his Store for sale.

60. On April 2, 2017, at approximately 11:00 p.m., while SINGH was working in the office/storage area, a tile fell from the roof and hit SINGH on the head and shoulder. Since SINGH could not get help, he called 911. Emergency responders arrived, checked SINGH out, and offered to transport him to the hospital. Since SINGH did not have health insurance, he declined.

61. SINGH tried to inform DEFENDANT MARKS of his injury and to determine what the protocol was for such a situation as well as a contact for medical attention. Defendant MARKS did not respond. SINGH was driven home and remained disoriented, in pain, and nauseated. SINGH's shoulder and neck remained moderately painful.

62. On April 3, 2017, SINGH went to Urgent Care in Rancho Cucamonga and paid $100.00 out-of-pocket for the visit. The nurse at the urgent care facility attempted to contact Defendant MARKS for payment or workers compensation account information. Defendant MARKS answered the call but told the nurse he would call back in ten (10) minutes, which he never did. SINGH remained at the urgent care facility for a total of two-and-one-half (2-1/2) hours. When Defendant MARKS finally responded, he was not concerned about SINGH's well-being, the protocol SINGH was to follow, or the medical attention SINGH required. Defendant MARKS merely asked SINGH to take pictures of the roof. SINGH informed Defendant MARKS that he was in no condition to worry about pictures whereupon Defendant MARKS told SINGH not to worry, that he had already taken pictures.

63. Since the date the Store closed for the pest problem, 7-ELEVEN has been relentlessly trying to drive SINGH out of business. 7-ELEVEN has carried out a pattern of constant and needless harassment and breach of the franchise agreement.

64. SINGH was ordered to replenish his "equity account" with $10,000.00 or face a non-curable breach without explanation or proof that the monies taken by 7-ELEVEN were allowable

withdrawals.

65. As a result of Defendants' multiple and continuous breaches of the contract, SINGH has suffered damages in an amount to be proven at time of trial.

WHEREFORE, SINGH prays judgment against Defendants, and each of them, as follows:

1. For rescission of the settlement entered into at mediation;
2. For general damages in a sum to be proved at time of trial;
3. For lost income from SINGH's equity account according to proof;
4. For costs of suit herein incurred; and
5. For such other and further relief as the Court may deem proper.

DATED: September 22, 2019

X _____
CHARANJOT SINGH
Plaintiff In Pro Per

**VERIFICATION**

I, CHARANJOT SINGH, am the Plaintiff in the above-entitled action. I have read the foregoing Complaint and know the contents thereof. The same is true of my own knowledge, except as to those matters which are therein alleged on information and belief; and, as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed on September ___, 2019, at Chino, California.

X _____
CHARANJOT SINGH